WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Gary Greenburg; Barbara Greenburg, ) | No. CV-04-0001-PHX-SRB |
| )  Plaintiffs/Counterdefendants, ) | **ORDER** |
| ) vs. ) | |
| ) Roberts Properties, Ltd.; et al., ) | |
| )  Defendants/Counterclaimants. ) | |
| _____) | |

*Pro se* Plaintiff Gary Greenburg forged material documents, submitted them to the Court, then lied to the Court repeatedly about whether he had committed the forgery. These are the basic conclusions that the Court has reached following an evidentiary hearing prompted by a motion to dismiss filed by Defendants pursuant to Federal Rule of Civil Procedure 11 ("Rule 11") and the Court's inherent power to police itself against fraud (Doc. 140). In the pages that follow, the Court will explain the basis of those conclusions and the penalties that will befall Plaintiff as a result.

## I. BACKGROUND

The Court has described the relevant factual background in its Order dated December 23, 2005 (Doc. 157).[1] To briefly summarize: Before signing a lease to become a tenant in Defendants' RV park ("Resort"), Plaintiff received written permission from the Resort's manager, Defendant Craig Pat Suddarth ("Suddarth"), to construct a mobile home according to certain specifications (the "First Plans"). Plaintiff did not construct his home according to those specifications, and said it was because Suddarth gave written approval for two sets of modifications to the original plans (respectively, the "Second Plans" and "Third Plans"). Defendants contend that Suddarth did no such thing, but that Plaintiff forged Suddarth's signature on the Second and Third Plans. When Defendants informed Plaintiff that his home must be constructed in accordance with the First Plans, Plaintiff refused to comply, and this action eventually followed.

On September 26, 2005, Defendants filed a motion to dismiss this action under Rule 11 and the Court's inherent power to protect itself against fraud. The motion asserted that Plaintiff had forged Suddarth's signature on the Second and Third Plans, perjured himself by attaching those documents to his verified Complaint, then perjured himself again during his deposition by testifying under oath that the documents in question bore Suddarth's actual signature.

The Court held an evidentiary hearing to resolve the issue of whether Suddarth's signatures on the Second and Third Plans were forgeries.[2] That hearing lasted part of two days, January 9, 2006 and February 3, 2006.

---

[1] In that Order, the Court mistakenly referred to Plaintiff Gary Greenburg's wife, Barbara Greenburg, as a plaintiff. She is not, as Defendants' request to add her as a party plaintiff was denied. (Doc. 82.) She is, however, a counterdefendant in the claims filed by Roberts Properties, Ltd., Craig Suddarth and Cherie Suddarth (Doc. 85).

[2] It is important to note that Plaintiff attached the *original* Second and Third Plans to his verified Complaint. (Compl., Ex. 11, 14.) In other words, those documents bear what Plaintiff alleges to be Suddarth's actual signature, not just a photocopy thereof.

- 2 -

1  **II.    THE EVIDENTIARY HEARING**

2      **A.    Defendants' Evidence**

3      Defendants called only one witness, but the testimony of a second witness is part of the record.  Attached to Defendants' Motion to Dismiss is the declaration of Suddarth, in which he states under oath that while he signed and approved the First Plans (Compl.[3] Ex. 5), he never signed or even saw the Second or Third Plans.

    Defendants' sole witness was William J. Flynn, a forensic document examiner who was permitted to testify as an expert.[4]  Flynn personally examined Exhibits Eleven and Fourteen to the Complaint on two occasions.  On the first occasion, he examined the signatures with a microscope, and also made a digital scan of the signatures.  On the second occasion, he used a digital microscope with capture capability.  His analysis of the signatures led him to the conclusion that both were scanned then printed onto the respective documents using an inkjet printer.  He also concluded the word "Approved" above the signatures was scanned then inkjet printed.

    These conclusions were based on the following[5]:

---

[3]While the Complaint has been amended three times, the Court will continue to cite to the original Complaint, as it contains the original documents at issue - the First Plans (Exhibit 5), the Second Plans (Exhibit 11), and the Third Plans (Exhibit 14).

[4]The Court will not summarize Flynn's impressive credentials here, as a full description is available in the transcript of the evidentiary hearing (Doc. 177). Even Plaintiff did not dispute that Flynn is one of the country's foremost authorities on handwriting analysis.

[5]To assist in his presentation, Flynn prepared a series of Microsoft Powerpoint slides, many of which consisted of images captured by his digital microscope.  Copies of those slides were provided to Plaintiff and to the Court.

- 3 -

- inkjet printers, which impart ink by spraying it onto the page, leave overspray marks that can be seen on Exhibit 11[6] when the words "Approved" and "Pat" are magnified using the digital microscope. (R. at 32-33.)[7]
- the ink used in inkjet printers is liquid, and when it comes into contact with a piece of paper, a phenomenon known as wicking occurs, in which the raised fibers of the paper act just like the wick of a candle and pull the ink away from where it was sprayed. (R. at 32, 35.) One could observe the phenomenon of wicking by placing a drop of red dye on a piece of paper towel, as the dye would noticeably expand outward as it was absorbed away from the initial drop. (R. at 35-36.)
- Both the word "approved" and the word "Pat" on Exhibit 11 show signs of wicking under magnification. (R. at 32, 35.)
- Overspray and wicking would not have occurred had a rubber stamp been used to create the word approved. (R. at 33.) Overspray and wicking would also not have occurred if the words had been created with a ballpoint pen, as were Plaintiff's initials "GG" on Exhibit 11. Ballpoint pen ink is highly viscous, and it does not wick. (R. at 36.) Nor does ballpoint ink produce overspray (R. at 37.)
- When Plaintiff placed his initials on Exhibit 11 in red ballpoint ink, he made a vertical line to the left of the first "G."[8] Viewed microscopically, there is black inkjet ink beneath that line, in what Flynn hypothesized was an attempt by Plaintiff to cover the fact that he had scanned Suddarth's signature then printed it onto the page with an inkjet printer. (R. at 37.) According to Flynn, the inkjet line was "an

---

[6]The exhibit numbers refer to the number assigned to the document in the original Complaint, not by defense counsel at the evidentiary hearing.

[7]Citations to the record refer to the official transcript of the evidentiary hearing. (Doc. 177.)

[8]Plaintiff stipulated that he personally initialed Exhibit 11, and drew a vertical line to the left of his initials. (R. at 34.)

- 4 -

artifact of the cut and paste process" that Plaintiff employed to place the word "Pat" onto the page. (R. at 39.)

- The "cut and paste process," according to Flynn, involved Plaintiff cutting out the word "Pat" from one document, pasting it onto another, then scanning that document. (R. at 39.) The vertical line appears to the left or to right of the pasted portion of the document, "depending on the movement of the scan lamp." (R. at 39.)

- Prior to the hearing, Flynn conducted an experiment to see if he could reproduce the phenomenon of the vertical line. He cut out his own signature, pasted it onto another document, scanned it, and a dark bar appeared to the right of his name. The reason the bar appeared to the right of his name and not the left, as in Exhibit 11, is because of the direction the scan light was moving. (R. at 59.)

- Exhibits 5 and 14 do not contain a vertical line near Suddarth's signature. Flynn theorizes that this is because whereas Exhibit 11 was created by physically cutting out "Pat", placing into the document, then scanning it, Exhibits 5 and 14 were created using an "electronic cut and paste where a graphic of the signature was transferred. When you transfer a graphic, the scanning process doesn't take place, so there would be no artifacts of that type." (R. at 60-61.)

- Exhibit 14 contains the words "Approved" and "Pat S" both of which show the signs of inkjet printing: wicking and overspray. (R. at 44.)

- There are other indications that "Pat S" was scanned and printed onto Exhibit 14. Digital scanners function at a certain resolution, which is measured in dots-per-inch. For example, if a scanner functions at 300 dpi, it cannot absorb "a piece of relevant data that's closer than three-hundredths of an inch." (R. at 46.) The same is true of printers, so if a printer prints at 300 dpi, it cannot produce dots closer than three-hundredths of an inch together. (R. at 46-47.)

- When Exhibit 14 is viewed at a certain level of magnification, one is able to see the distance between the dots. When one views "Pat S" at such a level, one can actually

- 5 -

see the lines that were created either by the scanning, the printing or a combination of the two. (R. at 47.) The lines are so close together that it would be impossible for a human being to create them by hand. (R. at 48.)

- In contrast, the initials "G.G.", the date "9/3/2003", and the line beneath "Pat S" and the "x" to the left of it were written in ballpoint ink. (R. at 42.) None of those pen-strokes, when analyzed at a high-level of magnification, reveal any scan-lines, wicking or overspray.

- Because "Approved" and "Pat S" were printed onto the page, they were likely on the page *before* the line with the "x" to the left of it was drawn on with ballpoint pen. In other words, Plaintiff likely drew that line to create the appearance that "Pat S" had signed on the line, when in fact "Pat S" was already on the page at the time the line was drawn. (R. at 42-43.)[9]

- The signature that appears on Exhibit 5 and the signature that appears on Exhibit 11 are identical - they "exactly overlay" and the "dash after the 'Pat' aligns in the same position. (R. at 52-53.) "The probability of that happening in two individually made signatures is null." (R. at 55.) The explanation for the perfectly coincident nature of the two signatures is that they are both inkjet reproductions. (R. at 56.)

- "Exactly overlay," is a "term of art" as "no copy is ever going to be exactly the same as the parent," and it is impossible to tell how many generations passed between the respective copies of the signatures. (R. at 53.)

- Flynn made no mention of observing any indentation on or near Suddarth's alleged signatures.

Flynn was confident in his conclusions: "There are many levels of certainty that I can ascribe to my reports if I'm not certain, and I'm a reasonably conservative examiner in that regard. But in this particular case, I'm 100 percent certain. There's no doubt in my mind this

---

[9]In fact, when Plaintiff testified, he did not dispute that he placed the line beneath "Pat S" along with the "x" *after* Suddarth had already signed the document.

- 6 -

1  is a scanned signature of 'Pat S' that has also been machine rendered using an inkjet printer."
2  (R. at 48; *see also* R. at 105.)
3        Plaintiff cross-examined Flynn, and failed to cast doubt on any of Flynn's conclusions.
4  Plaintiff did, however, elicit the following information:

- Flynn considered and rejected the possibility that Suddarth's signatures were created with a felt tip pen.  A felt tip pen, according to Flynn, could not have been used to create the microscopic striations that were created in the scanning or printing process.  (R. at 66.)
- Flynn considered and rejected the possibility that the overspray that Flynn identified on Exhibits 11 and 14 could have already been present on the page at the time Suddarth allegedly signed the documents.  Overspray is produced "where droplets continue to fly after the inkjet head cuts off."  (R. at 71-72.)  Because of this phenomenon, overspray appears on only one side of the printed signature. (R. at 71-72.) It would be "miraculous" and "impossible" for the overspray droplets to appear "at exactly the right positions ahead of time before the signature was signed."  (R. at 72.)
- Flynn considered and rejected the possibility that the wicking was actually hair, as Flynn examined the document under a microscope and observed wicking, not hair. (R. at 75.)
- It is worth noting that at no point in his cross-examination of Flynn did Plaintiff ask Flynn whether he noticed any indentations on, near, or beneath Suddarth's alleged signatures.

**B.**   **Plaintiff's Evidence**

Plaintiff's evidence, all of which was presented on the second day of the evidentiary hearing, consisted mainly of his denial that he fabricated Suddarth's signature on Exhibits 11 and 14.[10] Other notable aspects of Plaintiff's testimony included the following:

- Plaintiff urged the Court to examine Exhibits 11 and 14 for signs of indentation that were caused when Suddarth allegedly signed the documents. Such indentations, according to Plaintiff, would be inconsistent with marks made by an inkjet printer, which is non-impact.
- Plaintiff claimed that he personally witnessed Suddarth placed the "Approved" stamp on Exhibit 11, then sign his name to that document.
- Plaintiff changed his position with regard to whether he personally witnessed Suddarth sign and stamp Exhibit 14. Whereas before the hearing, Plaintiff's position was that he saw Suddarth sign and stamp Exhibit 14, at the hearing, Plaintiff testified that he retrieved the document from Suddarth's office after it had already been stamped and signed.
- Plaintiff admitted that, on Exhibit 14, he placed an "x" and a line beneath Suddarth's alleged signature *after* the signature was already on the page.
- Plaintiff attempted to refute Flynn's testimony that as one makes successive copies of an image, each successive copy may degrade slightly in quality. Plaintiff submitted into evidence Exhibit 18, which is five copies of the word "Gary" written by Plaintiff. According to Plaintiff, there is no degradation that occurred.
- Plaintiff attempted to refute Flynn's testimony that overspray occurs on inkjet printers. Plaintiff submitted into evidence Exhibit 19, a magnified "A" that he allegedly created with an inkjet printer. According to Plaintiff, there is no overspray.
- Plaintiff did not offer any expert testimony to refute any of Flynn's conclusions.

---

[10]Before calling himself to the stand, Plaintiff called his wife, Barbara Greenburg, and Clarence Farr, a former assistant manager at the Resort. Neither of those witnesses provided any testimony that bore on the issue before the Court.

- 8 -

### C. The Court's Conclusions

Plaintiff takes too literally the maxim that justice is blind, for justice would actually have to be blind not to see that the signatures Plaintiff has tried to pass off as authentic are in fact forgeries.

While the explanation of this conclusion could begin with Flynn's persuasive testimony and Plaintiff's failure to refute any of it, the Court will begin with Plaintiff's despicable behavior between the two days that the evidentiary hearing occurred. As mentioned above, the first day of the hearing was January 9, 2006 and the second day was February 3, 2006. During the interim, the Court file, which contained the original Complaint and Exhibits 11 and 14 thereto, was in the Court's possession the entire time, with one exception: when Plaintiff requested and viewed the file on January 13, 2006. On the second day of the hearing, the Court was somewhat surprised that Plaintiff made the argument for the first time that Suddarth's signatures were authentic because they left an indentation in the page created by the force of the pen.[11]

This argument was surprising because one would think that, if there were in fact indentations, Plaintiff would have cross-examined Flynn on that point, and attempted to undercut Flynn's conclusion that the signatures had been created with an inkjet printer. This argument was also surprising because the Court had closely examined Exhibits 11 and 14 before the first day of the hearing and had not noticed any indentations.

Low and behold, after the second day of the hearing, the Court examined Exhibits 11 and 14 and found that indentations had magically appeared *near* Suddarth's signature. One explanation as to how these indentations were made is that Suddarth pressed down so hard

---

[11]In his response to a recent motion filed by Defendants, Plaintiff has made it abundantly clear that the presence of indentations on Exhibits 11 and 14 is the centerpiece of his case as to why he is not a forger. (Pl.'s Resp. to Defs.' Mot. to Continue at 1-2, arguing against a continuance in light of undisputed evidence of "depression indentation marks in the paper as a result of the signatures in question having been written with a writing instrument such as a pen. Universally known that an inkjet printer never leaves an imprint such as this on paper [sic].").

1 on the page when he signed his name that the indentations appeared not only on the signature
2 page but on the two pages beneath it.

3       This explanation, however, is foreclosed by the fact that the indentations were not
4 present on Exhibits 11 or 14 before Plaintiff examined the file on Friday, January 13, 2006.
5 It is also foreclosed by the fact that the indentations do not perfectly correspond with
6 Suddarth's alleged signature. Rather, the indentations appear at a noticeable distance from
7 the lines allegedly constituting Suddarth's signature. In the case of Exhibit 11, where the
8 letters "a" and "t" (part of "Pat") are particularly small and the lines particularly intricate, the
9 indentations do not even remotely correspond to the actual lines. Also, the Court finds it
10 inconceivable that had the markings actually been created by Suddarth himself, Flynn, one
11 of the country's leading handwriting experts who examined the documents for nearly two
12 hours, would not have noticed them.

13       The only plausible explanation is that Plaintiff checked out the Court file and used
14 some sort of pointed instrument to create the appearance that Suddarth had actually signed
15 the documents. Plaintiff's hastiness was one of the many reasons of his undoing. He did not
16 take proper care to insure that the indentations he was making in the page corresponded to
17 the forged signature.

18       Needless to say, Plaintiff's actions fatally undermine his argument that the signatures
19 are authentic. Even without that behavior, Plaintiff's credibility was in shambles:

20     • He offered no explanation for Flynn's persuasive testimony that the signatures
21         were created by an inkjet printer.
22     • In particular, he offered no explanation for the pattern of overspray and no
23         explanation for the wicking.
24     • Plaintiff offered no explanation for the striations in Suddarth's alleged signature
25         which reveal that the signature was scanned then printed.
26     • Plaintiff offered no plausible explanation for the presence of the vertical line to
27         the left of his name on Exhibit 11. It is obvious to the Court that Plaintiff placed
28

|   |   |
|---|---|
| 1 | that vertical line next to his name to conceal the "artifacts" of the scanning |
| 2 | process. |

- On Exhibit 14, Plaintiff admitted to placing a line and an "x" beneath Suddarth's alleged signature after Suddarth had already signed the document. It is clear that Plaintiff placed the line there to further the illusion that Suddarth had signed the document after the line and the "x" had been drawn.

- Plaintiff offered no plausible explanation for the fact that the signatures as well as the dash to the right of the signatures on Exhibits 5 and 11 perfectly overlay. While some minute differences can be observed, the Court accepts Flynn's testimony that these differences are attributable to the photocopying process.

- Plaintiff's attempt to refute this argument with Exhibit 18, his experiment about the effects of photocopying on an image, is rejected. Because it is not known what type of copier or what type of copying process Plaintiff employed to forge Suddarth's signature, evidence from a different photocopier, perhaps of higher quality, is worthless.

- Plaintiff, by his own admission, has worked as a consultant in the computer industry for thirty years, and is deeply familiar with printers and scanners. To conduct the relatively simple forgery process was entirely within the realm of Plaintiff's knowledge and experience.

In sum, while Plaintiff testified that he is not a perjurer or a forger, the Court concludes otherwise. There is no doubt whatsoever that Suddarth's signatures on Exhibits 11 and 14 are forgeries and that Plaintiff is the forger.

## III.    CONSEQUENCES

1 "Courts cannot lack the power to defend their integrity against unscrupulous
2 marauders; if that were so, it would place at risk the very fundament of the judicial system."
3 *Aoude v. Mobile Oil Corp.,* 892 F.2d 1115, 1119 (1st Cir. 1989).

### A. The Court's Inherent Authority

Courts have an array of sanctions that may be imposed in response to abusive litigations practices. *See Sun World, Inc. v. Lizarazu Olivarria,* 144 F.R.D. 384, 390 (E.D. Cal. 1992). Such sanctions include dismissal or default judgment and the payment of the opposing parties' costs and attorneys' fees. *Id.* (citing *Fjelstad v. Am. Honda Motor Co.,* 762 F.2d 1334 (9th Cir. 1985); *Wyle v. R.J. Reynolds Indus., Inc.,* 709 F.2d 585, 589 (9th Cir. 1983); *United States Med. Enters., Inc.,* 792 F.2d 906, 910 (9th Cir. 1986); *Thompson v. Housing Auth. of the City of Los Angeles,* 782 F.2d 829, 831 (9th Cir. 1986); *Halaco Eng'g Co. v. Costle,* 843 F.2d 376, 380 (9th Cir. 1988)). *See Hazel-Atlas Glass Co. v. Hartford Empire Co.,* 322 U.S. 238, 245-46, 64 S. Ct. 997, 1001 (1944); *Combs v. Rockwell Int'l Corp.,* 927 F.2d 486 (9th Cir. 1991) (affirming dismissal of an action, pursuant to Rule 11 and the court's inherent powers, where the plaintiff, after permitting his lawyer to materially alter the plaintiff's deposition transcript, swore under penalty of perjury that he had reviewed the transcript and made the corrections personally); *Aoude,* 892 F.2d at 1115 (affirming dismissal where the plaintiff forged a purchase agreement "that formed the complaint's centerpiece," attached it to his complaint, then swore to its authenticity in depositions and propounded discovery requests based on the assumption that it was authentic).

> To dismiss a case under its inherent powers, the Court must consider
> (1) the existence of certain extraordinary circumstances, (2) the presence of willfulness, bad faith, or fault by the offending party, (3) the efficacy of lesser sanctions, (4) the relationship or nexus between the misconduct drawing the dismissal sanction and the matters in controversy in the case, . . .

*Halaco Eng'g Co.,* 843 F.2d at 380; *Sun World, Inc.,* 144 F.R.D at 390.

1    Plaintiff's actions have satisfied all of the above criteria. First, this case presents
2 extraordinary circumstances. Plaintiff attached the forged documents to his Complaint,
3 verified that Complaint, lied about its authenticity in his deposition, filed a second action
4 against Defendants stemming from similar allegations, tampered with and altered the Court's
5 file, and perhaps most appallingly, sat on the witness stand, looked the Court in the eye, and
6 lied about all of it.

7    Second, as should be clear from the above discussion, Plaintiff's actions were willful
8 and in bad faith. Third, lesser sanctions would be ineffective. This action was premised
9 upon Plaintiff's lies; it has been marred every step of the way by Plaintiff's lies, and he has
10 shown no remorse. An attempt to excise the fraudulent aspects of Plaintiff's case from the
11 non-fraudulent ones through some lesser sanction is an impossibility, for even assuming there
12 are non-fraudulent ones (a fact about which the Court has considerable doubt), those aspects
13 are premised upon and hopelessly bound up with the fraudulent aspects. To allow this action
14 to proceed would be to condone Plaintiff's behavior.

15    Fourth, the forged documents are the foundation of this action. Plaintiff was told to
16 stop constructing his mobile home because it did not comport with the plans authorized by
17 Suddarth. Instead of complying, Plaintiff forged documents suggesting that he had in fact
18 been authorized to construct his mobile home in a different manner from the original plans.
19 Plaintiff then allowed himself to become embroiled in a bitter dispute with Defendants
20 premised on the fact that they had given him permission to do something but revoked it and
21 lied about it. If Plaintiff had not forged the documents, and if he had not relied on those
22 forged documents, there would be no dispute. *See Aoude,* 892 F.2d at 1115 (affirming
23 dismissal where action was premised upon forged purchase agreement).

24    In light of Plaintiff's behavior, the Court exercises its inherent authority to dismiss this
25 action. Additionally, it would be unjust for Defendants to have to pay for the cost of

defending this frivolous action. Plaintiff will be ordered to pay all of Defendants' reasonable attorneys' fees and costs.[12]

**B.     Rule 11**

The authority for dismissal and other sanctions also comes from Rule 11, which provides

> Every pleading, motion, and other paper of a party represented by an attorney shall be signed by at least one attorney . . ., or, if the party is not represented by an attorney, shall be signed by the party. . . .
>
> (b) **Representations to Court.**  By presenting to the court . . . a pleading, written motion, or other paper, . . . an unrepresented party is certifying that to the best of the person's knowledge, information and belief, . . . (1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation; (2) the claims, defenses and other legal contentions therein are warranted by existing law . . .; (3) the allegations and other factual contentions have evidentiary support . . .; and (4) . . . .
>
> (c) **Sanctions**. If . . . the court determines that subdivision (b) has been violated, the court may . . . impose an appropriate sanction upon . . . the parties that have violated subdivision (b).

Here, Plaintiff has violated Rule 11. He submitted to the Court a Complaint, a First Amended Complaint, a Second Amended Complaint and a Third Amended Complaint. All of those documents were signed and verified by Plaintiff himself. All of those documents were presented for the improper purpose of defrauding the Court and harassing Defendants. None of the claims are warranted by existing law, and the factual contentions lack evidentiary support.

---

[12]Plaintiff has never argued that if it was proven that he had committed perjury and forgery, dismissal and an awarding of attorneys' fees and costs would be too severe a sanction.

- 14 -

Dismissal and awarding of attorneys fees and costs is an appropriate sanction within the meaning of Rule 11. *See Combs,* 927 F.2d 486; *Sun World,* 144 F.R.D. at 389-90. For all the reasons discussed above, the Court imposes those sanctions on Plaintiff. Significantly, he has shown no remorse, and despite the detection of his lies at every turn, Plaintiff has dug his heels in deeper and pressed on with this litigation, filing a second action, lying at his deposition, tampering with the Court's file, and even lying to the Court face-to-face. Justice demands the harsh treatment of such behavior.

## IV.     OTHER MOTIONS

### A.     Defendants' Motion to Continue

Defendants' have filed a motion to continue the trial and pre-trial deadlines (Doc. 183). The Court will withhold ruling on that motion at the present time to allow Defendants to decide whether they would still like to proceed with their counterclaim against Plaintiff in light of the Court's ruling on Defendants' motion to dismiss.

### B.     Defendants' Motion to Consolidate

Defendants have filed a motion to consolidate a different action filed by Plaintiff currently pending before Judge James Teilborg with the present one. The decision of whether to consolidate falls within the Court's discretion, *see* Fed. R. Civ. P. 42(a), and the Court declines to exercise that discretion in favor of consolidation. However, the Court will provide a copy of this Order to Judge Teilborg.

**IT IS ORDERED** granting Defendants' Motion to Dismiss (Doc. 140). Plaintiff's Third Amended Complaint is dismissed with prejudice.

**IT IS FURTHER ORDERED** that Plaintiff shall pay all costs and attorneys' fees incurred by Defendants in defending this case.

**IT IS FURTHER ORDERED** that Defendants shall submit an application for attorneys' fees and costs within thirty days of this Order.

1  **IT IS FURTHER ORDERED** denying Defendants' Motion to Consolidate with
2  CV05-2586. (Doc. 149).

4  DATED this 16th day of February, 2006.

_Susan R. Bolton_
Susan R. Bolton
United States District Judge